CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAY 20 2019
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| ANGELA L. G. WEINERTH, | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil Action No. 4:17-CV-00067<br>)<br>) |
| | ) By: Hon. Michael F. Urbanski |
| MARTINSVILLE CITY SCHOOL BOARD, | ) Chief United States District Judge<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION

In this employment action, plaintiff Angela L. G. Weinerth ("Weinerth") claims that she was removed from her position as principal of Martinsville High School and reassigned as assistant principal at Martinsville Middle School because of her race, sex, and age, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. Currently pending before the court is the Martinsville City School Board's ("School Board") motion for summary judgment. In that motion, the School Board presents substantial evidence that Weinerth was reassigned from the high school to the middle school for legitimate, nondiscriminatory reasons. The matter has been fully briefed, and the court heard oral argument on March 11, 2019. After review of the entire record, the court concludes that, in the face of the evidence of nondiscriminatory motives adduced by the School Board, Weinerth has wholly failed to present evidence sufficient to establish a genuine issue of material fact as to whether the School Board's asserted reasons for reassigning Weinerth were a pretext for

unlawful discrimination. As such, the School Board's summary judgment motion is **GRANTED** and this case dismissed.

## I.

The following facts taken from the summary judgment record are either undisputed or presented in the light most favorable to Weinerth, the nonmoving party. See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986).

Weinerth is a white female over the age of 60. Weinerth Decl. ¶ 3, ECF No. 102-1. She has over 40 years of experience as a teacher and administrator in the Commonwealth of Virginia. Id. at ¶ 6. Weinerth has worked for the Martinsville City Public Schools ("School System") since 2005, when she was hired to teach in the scholars' program at Martinsville Middle School. Id. at ¶ 7.

In 2012, Weinerth was appointed to the position of assistant principal at Martinsville High School. Id. at ¶ 8. At that time, Pamela Heath ("Heath") was the superintendent of the School System and Ajamu Dixon ("Dixon") was the principal of the high school. Id. at ¶¶ 8, 9. Dixon, a black male under the age of 40, had served as principal since 2011. Id. at ¶¶ 4, 9.

According to Weinerth's allegations, at the time she started at the high school, the students there were falling behind academically and scoring poorly on the state's Standards of Learning ("SOL") tests. Id. at ¶ 10. On more than one occasion, Weinerth voiced concerns to Dixon regarding the students' declining academic performance. Id. at ¶ 11. Dixon did not respond favorably to Weinerth's suggestions and instructed her to "back off." Id. (internal quotation marks omitted). The high school ultimately lost its full-accreditation rating from the state.

At the conclusion of 2012–2013 school year, Heath completed a "Principal Summative Performance Report" for Dixon, in which she rated Dixon's performance as "Unacceptable" in the following six categories: instructional leadership, school climate, human resources management, organizational management, professionalism, and student academic progress. Pl.'s Ex. D, ECF No. 102-4, at 3–10. Heath noted, among other deficiencies, that Dixon demonstrated "[e]xtreme inconsistencies in modeling mutual respect, concern, and empathy for students, parents, and staff"; that he did "not inspire an environment of trust"; that he was "[i]nconsistent in addressing student and staff discipline"; and that he did not adequately "plan[] for increased student academic progress." Id. at 4, 9. Heath recommended that the School Board not renew Dixon's contract for the position of principal. Id. at 10.[1]

The record indicates that the School Board followed Heath's recommendation. By letter dated June 11, 2013, Heath advised Dixon that his contract for the principal position would not be renewed by the School Board for the 2013–2014 school year. Id. at 2. He was subsequently reassigned to an administrative position within the School System's central office. Weinerth Decl. ¶ 15.

With the approval of the School Board, Heath promoted Weinerth to the position of principal for the 2013–2014 school year. Heath Decl. ¶ 8, ECF No. 102-2. Weinerth faced several challenges upon assuming her new position, including more rigorous SOL benchmarks imposed by the state, severe budget cuts, and disciplinary problems. Weinerth Decl. ¶ 17; Heath Decl. ¶ 11. Weinerth maintains that she made it her "mission" to address each of these challenges. Weinerth Decl. ¶ 18.

---

[1] Dr. Zebedee Talley, Jr., the present Superintendent of the Martinsville City Public Schools takes issue with this "scathing review," questioning its objectivity and credibility. Talley Aff., ECF No. 100-8, at 6.

Weinerth ultimately served as principal of the high school for three years. At the conclusion of the 2015–2016 school year, Heath commended Weinerth's "efforts and advancements in improving the school," and "congratulated her on achieving continuing contract status as a principal as of June 15, 2016."[2] Heath Decl. ¶ 27.

It is undisputed that standardized test scores improved during Weinerth's tenure as principal. However, the parties disagree as to whether Weinerth effectively addressed the school's disciplinary problems. Although Heath's declaration indicates that "student behavior improve[d]" during Weinerth's tenure as principal, Heath Dec. ¶ 24, the affidavits presented by the School Board paint a very different picture. See, e.g., Aff. of Karen Sawyer, ECF No. 100-9, at 1 (describing students as "rowdy and somewhat out of control" during Weinerth's tenure as principal); Aff. of Gerald Kidd, ECF No. 100-12, at 1 (emphasizing that "[t]here were at least 46 reported fights between students during Mrs. Weinerth's first year as principal," and that "[s]tudents were frequently not in class, skipped their classes completely, or left school early").

Heath suddenly retired from the School System on July 14, 2016. Weinerth Decl. ¶ 25. Two days later, on July 16, 2016, Dr. Zebedee Talley, Jr. ("Talley"), a black male, was named interim superintendent. Talley had served as principal of Patrick Henry Elementary School ("Patrick Henry") in the City of Martinsville since July 1, 2012. Id. At the time of Talley's

---

[2] Under Virginia law, a public school principal acquires "continuing contract status" after serving a probationary term of three years in that position. Va. Code § 22.1-294. Upon obtaining continuing contract status, a teacher or administrator "can only be terminated for good cause." Echtenkamp v. Loudon Cty. Pub. Schs., 263 F. Supp. 2d 1043, 1054 (E.D. Va. 2003); see also Hibbitts v. Buchanan Cty. Sch. Bd., 433 F. App'x 203, 206 (4th Cir. 2011) ("A Virginia public school administrator has a protected property right in her employment once she obtains continuing contract status.") (citing Wooten v. Clifton Forge Sch. Bd., 655 F.2d 552, 544–55 (4th Cir. 1981)).

4

promotion to Superintendent in July 2016, none of the schools in the School System were fully accredited by the state. Id.

On July 23, 2016, the local newspaper published an article titled, "School board wants a more diverse staff." Pl.'s Ex. C., ECF No. 102-3, at 2. After noting that more than 70 percent of the School System's staff members were white, the article reported that "the superintendent and the school board . . . believe a more diverse staff" could "improve the district's performance." Id. at 4. Talley was quoted as saying that "'[m]inority students do better and do well when they have people in authority who look like them,'" and that "'it's good to have a classroom and a school that represents the demographics of our [area].'" Id. (alteration in original). The article attributed similar comments to School Board member Victor Correa ("Correa"):

> "I think this community has a very large Africa[n] American community, and there has been a large request from parents for more African American teachers. In order for the students to have a more comfortable learning environment, I think it's important to the students to have a teacher that looks like them, Correa said. It's not just a Martinsville thing, it's a nationwide issue."
>
> Specifically, Correa said he'd like to see more black male teachers in the district, hoping they can serve as positive role models for students in their classes.

Id. at 5. At the time the statements were made, "the majority of the Martinsville High School student population was black and male." Weinerth Decl. ¶ 29.[3]

---

[3] As the School Board notes on brief, statements such as these are consistent with published studies. Indeed, the Virginia Board of Education's 2018 Annual Report on the Condition and Needs of Public Schools in Virginia states that "'[s]tudies have found that teachers of color boost the academic performance of all students generally, and the performance of students of color specifically.'" Def.'s Br. Supp. Mot. Summ. J., ECF No. 100, at 11 n.1 (quoting 2018 Annual Report at 12, available at www.doe.virginia.gov/boe/reports/index.shtml).

5

The day before the article was published, Talley called Weinerth while she was on vacation and inquired as to how many black teachers were employed at the high school.[4] Id. at ¶ 32. Weinerth informed Talley that she "was out of town, on vacation, and did not know the answer to his question, off the top of [her] head." Id. Weinerth also advised Talley that "performance was [her] top consideration" and that she did not recommend hiring teachers based on race or sex. Id. at ¶ 33. Talley asked Weinerth to count the number of teachers by race and report back to him with the information. Id. Weinerth did as she was instructed. Id.

A few days later, on July 26, 2016, Talley met with Weinerth and advised her that he was demoting her to the position of assistant principal at Martinsville Middle School.[5] Id. at ¶ 34. When Weinerth asked why she was being demoted, Talley allegedly "stated 'the community has spoken'" and "refused to elaborate." Id. ¶ at 36. At the time of the decision, Talley had not visited the high school during the school day or "discussed any aspect of [the high school's] operations or performance" with Weinerth. Id. at ¶ 39.

Talley maintains that his decision to remove Weinerth from the position of principal was motivated by "issues of safety and discipline at the high school." Talley Aff. at 3. In his affidavit, Talley acknowledges that the high school experienced "some academic progress" under Weinerth's leadership. Id. However, Talley emphasizes that "other concerns about the

---

[4] According to Talley, the inquiry was prompted by concerns voiced by Dianatha Williamson, a business teacher at the high school, who was being transferred to another school at Weinerth's direction. Talley Aff. at 4. Williamson reported that she was the only black teacher at the high school and that parents were unhappy with the transfer decision. Id.

[5] Prior to Talley's appointment as interim superintendent, the School Board adopted a resolution authorizing the superintendent to reassign personnel within the School System. Def.'s Ex. 4, ECF No. 100-4, at 5; see also Va. Code § 22.1-297 ("If the school board adopts a resolution authorizing the division superintendent to reassign . . . teachers, principals and assistant principals, the division superintendent may reassign any such teacher, principal or assistant principal for that school year to any school within such division, provided no change or reassignment during a school year shall affect the salary of such teacher, principal or assistant principal for that school year.").

6

environment for learning . . . overshadowed [Weinerth's] achievements." Id. In particular, Talley indicates that resource officers at the high school, as well as parents of high school students, "had expressed concerns about a lack of discipline and control within the school," and "many parents feared for the safety of their students." Id.

Talley's affidavit also emphasizes that "Weinerth's strengths are instruction and academics" and that "nearly [her] entire career as an educator was in a middle school setting." Id. At the time of Talley's decision, Martinsville Middle School had no assistant principal and "was in desperate need of an academic-driven administrator due to dropping assessment scores." Id. Talley indicates that he was familiar with Weinerth's abilities and experience from having previously worked with her, and that he "felt that she would excel at assisting and motivating teachers" at the middle school. Id.

After reassigning Weinerth to the middle school, Talley reinstated Dixon to the position of principal for the 2016–2017 school year. Id. at 4. Talley also reassigned Renee Brown, the black female assistant principal at the high school, to the position of assistant principal at Albert Harris Elementary School ("Albert Harris"). Id. Talley replaced Brown with Clarence Simington, a black male who had "experience not only in the school system but also in law enforcement." Id. According to Talley's affidavit, he determined that Dixon and Simington would be able to more effectively handle the disciplinary problems at the high school. See id. (opining that "the school was more structured, disciplined and safe during [Dixon's] tenure" and that Simington's employment background made him "well suited" for the position of assistant principal at the high school).

At some point subsequent to the reassignments, the high school regained full accreditation from the state. The school remains fully accredited. Weinerth Dep. 4, ECF No. 100-1.

The School Board has submitted lists of "teacher separations" for the 2013 to 2018 fiscal years. Def.'s Ex. 13, ECF No. 100-13, at 1–5. During the 2013 fiscal year, the School System lost twenty-eight teachers. Id. at 1. Of those, ten worked at the high school, nine worked at Albert Harris, and eight worked at the middle school. Id. During the 2016 fiscal year, the School System lost fifty-six teachers. Id. at 2–4. Of those, twenty worked at Albert Harris, sixteen worked at the high school, and fifteen worked at the middle school. Id.

## II.

In the instant action, Weinerth asserts claims of race and sex discrimination under Title VII, and a claim of age discrimination under the ADEA. The School Board has moved for summary judgment on all three counts.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. In deciding whether a genuine dispute of material fact exists, the court must "view[] the facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Woollard v. Gallagher, 712 F.3d 865, 873 (4th Cir. 2013). However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference

8

upon another, or the mere existence of a scintilla of evidence." Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013).

## III.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

A plaintiff may avoid summary judgment and establish a claim of race, sex, or age discrimination in one of two ways. First, a plaintiff may offer direct or circumstantial evidence of an employer's discriminatory animus. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc), abrogated in part by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). Second, a plaintiff may proceed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. at 285; see also Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 249 (4th Cir. 2015) (Title VII); Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004) (ADEA).

In their respective briefs, the parties analyze Weinerth's claims of discrimination under the McDonnell Douglas framework. Pursuant to this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Mereish, 359 F.3d at 334. If she succeeds, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. Once the defendant proffers a justification for the action at issue, "the burden shifts back to the plaintiff to prove by a preponderance of the

9

evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Hill, 354 F.3d at 285 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)). "The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

In moving for summary judgment, the School Board argues that Weinerth is unable to establish a prima facie case of race, sex, or age discrimination, or show that the asserted justifications for her reassignment were pretextual. Although the court concludes that Weinerth has established a prima facie case, it agrees with the School Board that Weinerth has not presented sufficient evidence from which a reasonable jury could conclude that the School Board's asserted reasons for her reassignment were a pretext for discrimination.

### A.

The plaintiff's initial burden under the McDonnell Douglas framework is "not onerous." Burdine, 450 U.S. at 253. To establish a prima facie case of discrimination, the plaintiff must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) that the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination." Adams v. Tr. of Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011).

## 1.

The School Board argues that Weinerth's claims fail at the second element because her reassignment was not an adverse employment action. For purposes of a discrimination claim under Title VII or the ADEA, an "adverse employment action" is one that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal quotation marks omitted). The United States Court of Appeals for the Fourth Circuit has held that a reassignment can constitute an adverse employment action "if the plaintiff can show that the reassignment had some significant detrimental effect." Id. (internal quotation marks omitted). Examples of such effects include a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Id. (internal quotation marks omitted).

In support of its argument, the School Board focuses on the fact that Weinerth's reassignment did not have an immediate effect on her salary or benefits. See Def.'s Br. Supp. Mot. Summ. J. ("Def.'s Br."), ECF No. 100, at 16 (emphasizing that the plaintiff's "salary and benefits were unchanged that year despite her new role"). As the foregoing precedent makes clear, however, an adverse employment action is not limited to situations in which an employee experiences a diminution in salary or loss of benefits. Instead, a reassignment can constitute an adverse employment action when it is accompanied by a change in job title or level of responsibility. James, 368 F.3d at 375. Because Weinerth was moved from the position of principal to that of assistant principal, a reasonable jury could easily find that her reassignment constituted an adverse employment action. Thus, Weinerth satisfies the second element of a prima facie case.

## 2.

The School Board also argues that Weinerth is unable to meet the third element. To satisfy this element, a plaintiff must present sufficient evidence from which a reasonably jury could find that "she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action." Hill, 354 F.3d at 285. The Fourth Circuit, like other appellate courts, has "qualified this requirement by clarifying that the plaintiff's burden in this regard is not an onerous one." Hill v. Se. Freight Lines, Inc., 523 F. App'x 213, 216 (4th Cir. 2013); see also Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1421 (10th Cir. 1991) (holding that the plaintiff "met his burden of production by introducing some evidence of good performance" and agreeing with the Second Circuit that "'proof of competence sufficient to make out a prima facie case of discrimination was never intended to encompass proof of superiority or flawless performance'") (quoting Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2d Cir. 1978)); La Montagne v. Am. Convenience Prods., Inc., 750 F.2d 1405, 1413–14 (7th Cir. 1984) (concluding that the plaintiff established a prima facie case with evidence that his job performance was generally satisfactory, despite other evidence to the contrary). "Although on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." Warch v. Ohio Cas. Ins. Co. 435 F.3d 510, 517 (4th Cir. 2006).

Viewing the record in the light most favorable to the plaintiff, the court concludes that a reasonable jury could find that, at the time of her reassignment, Weinerth was meeting her employer's legitimate job expectations. The record reveals that Weinerth was supervised by

12

Heath for all but the final twelve days of her three-year tenure as principal. Heath's declaration indicates that Weinerth not only "performed up to [Heath's] expectations," but "exceeded [her] expectations in those areas most critical to the success of Martinsville High School." Heath Decl. ¶ 29. Additionally, at the end of the 2015–2016 school year, Heath commended Weinerth's "efforts and advancements," which included increased test scores, and "congratulated her on achieving continuing contract status as a principal." Id. ¶ 27. The court believes that such evidence, when construed in Weinerth's favor, is sufficient to satisfy her burden at the prima facie stage. See Tillery v. Piedmont Airlines, Inc., 713 F. App'x 181, 186 (4th Cir. 2017) (finding this element satisfied where the plaintiff's supervisor "referred to him as 'a seasoned and competent employee'" six weeks prior to the plaintiff's termination) (internal quotation marks omitted); Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 766 n.2 (4th Cir. 2003) (finding this element satisfied where, among other things, the plaintiff "had been told that her performance was satisfactory").

Moreover, Weinerth has cited evidence from which a reasonable jury could find that certain proffered expectations were "not, in fact, legitimate." Warch, 435 F.3d at 517. For instance, while the School Board emphasizes that "the high school remained unaccredited" at the end of Weinerth's tenure, Def.'s Br. at 22, the same was true for all of the other schools in the City of Martinsville, including Patrick Henry, where Talley had served as principal since July 1, 2012. See Talley Aff. at 1 ("In 2014, all four city schools were accredited with warning, which means they were not fully accredited. In the summer of 2016, none of the schools within the City's school system were fully accredited."). Despite this deficiency, Talley was promoted to the position of interim superintendent.

13

Along the same lines, Martinsville High School was not the only school that "lost teachers at a significant rate" during the time frame in which Weinerth was principal. Def.'s Br. at 8. Instead, the record indicates that the middle school lost more teachers than the high school during the 2015 fiscal year, and that Albert Harris lost more teachers than the high school and the middle school during the 2016 fiscal year. While the School Board emphasizes that the number of teachers who left the high school nearly "doubled" from 2013 to 2016, Id. at 5, the number of teachers who left Albert Harris increased at an even higher rate. Nonetheless, there is no evidence that the principal of the middle school or Albert Harris was reassigned in 2016.

Based on the foregoing evidence, the court concludes that a genuine issue of material fact exists as to whether Weinerth was performing at an acceptable level at the time of her reassignment. Accordingly, the School Board is not entitled to summary judgment on the third element.

### 3.

The court also concludes that disputed issues of fact exist with respect to the fourth element of a prima facie case: that the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination." Adams, 640 F.3d at 559. A plaintiff can satisfy this element by showing that her position remained open or was filled by a similarly qualified applicant outside the protected class. Hill, 354 F.3d at 285; see also Dugan v. Albemarle County Sch. Bd., 293 F.3d 716, 721 (4th Cir. 2002) (noting that the fourth element in an ADEA case "is satisfied with proof of replacement by a substantially younger worker").

14

In this case, it is undisputed that Weinerth was replaced by a black male who is more than 20 years younger. The School Board nonetheless appears to argue that Weinerth's replacement by Dixon does not give rise to an inference of discrimination since Dixon "had previous experience as a principal" and "also had prior administrative experience in the School Board's Central Office." Def.'s Br. at 17. According to the plaintiff's evidence, however, Dixon was reassigned to the administrative position after Heath found his performance as principal to be unacceptable and the School Board declined to renew his contract for the 2013–2014 school year. Viewing the record in the light most favorable to Weinerth, the court concludes that the decision to replace Weinerth with Dixon supports an inference of discriminatory animus at this stage of the proceedings. The court therefore concludes that Weinerth has met her "relatively modest" burden of establishing a prima facie case of discrimination under Title VII and the ADEA. Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 545 (4th Cir. 2003) (internal quotation marks omitted).

### B.

Under the McDonnell Douglas framework, the burden shifts to the School Board to produce evidence of legitimate, non-discriminatory reasons for removing Weinerth from her position of principal. The employer's burden at this stage "is one of production, not persuasion," and involves "no credibility assessment." Warch, 435 F.3d at 514. Relying on affidavits from Talley and two of its members, the School Board maintains that the high school had "serious disciplinary issues" during Weinerth's tenure as principal and therefore needed a "strong disciplinarian as principal." Def.'s Br. at 23–24. Many other affiants attested to discipline and student behavior problems at the high school during this period, including

staff members who worked under Weinerth. For purposes of the pending motion, the court concludes that the School Board has satisfied its burden of production.

The burden therefore shifts back to Weinerth to prove that the asserted justifications for her reassignment were "not [the] true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285. A plaintiff can establish pretext by showing that the employer's "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of . . . discrimination." Mereish, 359 F.3d at 336 (quoting Burdine, 450 U.S. at 256). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148.

To prove pretext, a plaintiff must do more than present conclusory allegations of discrimination; rather, "concrete particulars" are required. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). A plaintiff must come forward with admissible evidence that is more than self-serving opinions or speculation. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). Federal courts do not serve to second-guess workplace decisions; thus, a claim of discrimination cannot be based on mere disagreement with an adverse employment decision. See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998).

> Particularly, this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . . Our sole concern is whether the reason for which the defendant [reassigned] the plaintiff was discriminatory. Thus, when an employer articulates a reason for [reassigning] the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair or even correct, ultimately, so long as it truly was the reason for the plaintiff's [reassignment].

Id. (internal quotation marks and citations omitted); see also Anderson v. Stauffer Chem. Co., 965 F.2d 397, 403 (7th Cir. 1992) ("The fact that an employee does some things well does not mean that any reason given for his firing is a pretext for discrimination . . . . Unless he attacks the specific reasons given for a termination, a plaintiff who stresses evidence of satisfactory performance is simply challenging the wisdom of the employer's decision, which we have consistently refused to review.") (internal quotation marks and citations omitted).

After considering the parties' arguments, exhibits, and the applicable law, the court concludes that Weinerth has failed to meet her "ultimate burden of persuading the court that she has been the victim of intentional discrimination." Burdine, 450 U.S. at 256. Even viewing the record in the light most favorable to the plaintiff, a reasonable jury could not find that the alleged discipline-related reasons for removing Weinerth as principal and replacing her with Dixon are unworthy of credence. Weinerth has not presented any evidence, beyond speculation and conjecture, that the discipline problems at the high school chronicled in the affidavits supporting the School Boards' motion were a pretext for discrimination.

At the outset, there is no direct evidence that Weinerth's race, gender, or age played any role in her reassignment. Indeed, there is no hint in this record that Weinerth's age or gender had anything to do with her move to the middle school. Race enters the picture by virtue of the published comments in favor of diversity enhancement, which were allegedly made by Talley and Correa at a School Board work session shortly after Talley was appointed interim superintendent and a few days before Weinerth was reassigned. The court does not believe that a reasonable jury could conclude that such aspirational statements in favor of enhanced diversity, in and of themselves, are evidence of discriminatory animus. See Johnson v. Metro. Gov't of Nashville & Davidson Cty., 502 F. App'x 523, 535 (6th Cir. 2012) (observing that

17

"statements reflecting a desire to improve diversity do not equate to direct evidence of unlawful discrimination"); Bernstein v. St. Paul Companies, Inc., 134 F. Supp. 2d 730, 739 n.12 (D. Md. 2001) (noting that an employer's "commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races . . . , is not proof of discriminatory motive with respect to any specific hiring decision," and that "it would be difficult to find today a company of any size that does not have a diversity policy").

Weinerth contends that the timing of the statements is indicative of race discrimination since they were made within a few days of her reassignment. Indeed, Weinerth makes much of the timing of her reassignment, arguing that because Talley made the personnel change just ten days after his appointment as interim superintendent and without hands-on knowledge of the situation at the high school, his decision must have been based on Weinerth's race, age or gender, rather than concerns related to student discipline or safety at the high school. To be sure, Talley acted fast, but the new school year was rapidly approaching. To suggest that the timing of Weinerth's reassignment is probative of race discrimination ignores the impending academic calendar and is wholly speculative and conclusory. Thus, this argument is insufficient to rebut the well-supported rationale presented by the School Board.

Nor is the declaration of the former superintendent, Pamela Heath, to the effect that Weinerth had performed well as principal of the high school and that student behavior improved during her tenure, sufficient to create a genuine issue of fact as to whether her reassignment was racially motivated. This evidence merely reflects Heath's post hoc disagreement with personnel changes made by her successor, and a court cannot base its ruling on such a disagreement. Again, the court's role is not to determine whether the reasons for which Talley reassigned Weinerth to the middle school at the outset of his tenure as interim

superintendent were "wise, fair, or even correct," but rather whether they "truly" were the reasons for the reassignment. DeJarnette, 133 F.3d at 299. To be sure, Heath's affidavit praises Weinerth, and her 2013 performance review of Dixon rated him as unacceptable, leading to his replacement as high school principal for the 2013-2014 school year. Obviously, former superintendent Heath and current superintendent Talley have different opinions as to the relative qualifications of Weinerth and Dixon. However, at the pretext stage of the analysis, "[i]t is the perception of the decision maker which is relevant." Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). Thus, Heath's difference of opinion is insufficient to create a genuine issue of material fact as to whether Weinerth's race, age, or gender was a determining factor in her reassignment. See Coleman v. Schneider Elec. USA, Inc., 755 F. App'x 247, 249 (4th Cir. 2019) (concluding that the fact that a former supervisor believed that the plaintiff performed her training tasks adequately was insufficient to establish pretext and emphasizing that "the hiring manager was entitled to form a different opinion"); Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269 (4th Cir. 2005) (recognizing that courts "cannot require that different supervisors within the same organization must reach the same conclusion on an employee's qualifications and abilities").

Weinerth's argument that the real reason for her reassignment was the fact that she did not look like most of the high school students is undermined by the fact that the same racial demographics exist at the middle school to which she was transferred and assigned a leadership position. Further undermining her argument that race motivated Talley's personnel changes is the fact that Renee Brown, the younger, black assistant principal at the high school, was reassigned to an elementary school at the same time. While Brown remained in the role of assistant principal, the fact that she was removed from the high school setting along with

Weinerth strongly supports the School Board's argument that race was not a determining factor in the management changes Talley made at the high school.

Finally, Weinerth hinges her case on the fact that Talley replaced her as high school principal with Dixon, a former principal whose performance was found to be unsatisfactory in many areas, including student and staff discipline, in the 2013 evaluation completed by the prior superintendent. Weinerth chose not to depose Talley, and it is not entirely clear from the existing record whether Talley was aware of this performance review in July of 2016, when he made the personnel changes at issue. Nonetheless, even assuming that he had knowledge of the prior evaluation, Talley was entitled to form different opinions regarding Dixon's capabilities and the individual schools' staffing needs. See Coleman, 755 F. App'x at 249; Anderson, 406 F.3d at 272. Thus, the fact that Talley's assessment of Dixon's qualifications and abilities differed from that of the previous superintendent is insufficient to raise an inference of pretext or discriminatory intent.

## IV.

For the reasons stated, the School Board's motion for summary judgment (ECF No. 99) is **GRANTED** and the case **DISMISSED**. An appropriate Order will be entered.

Entered: 05-20-2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge